UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH HERNANDEZ
OBO CINDY GOTAY (DECEASED)

      Plaintiff                Civil Action No. 18-10194

v.                             HON. VICTORIA A. ROBERTS
                               U.S. District Judge
                               HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL      U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

**REPORT AND RECOMMENDATION**

    Plaintiff Joseph Hernandez ("Plaintiff") on behalf of his deceased mother Cindy Gotay

("Claimant") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision

of Defendant Commissioner ("Defendant") denying her application for Supplemental

Security Income and Disability Insurance Benefits under the Social Security Act.  Both

parties have filed summary judgment motions which have been referred for a Report and

Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I

recommend that Plaintiff's motion [Docket #13] BE GRANTED to the extent that the case

is remanded to the administrative level for further proceedings, and that Defendant's motion

for summary judgment [Docket #18] be DENIED.

## I.  PROCEDURAL HISTORY

On April 1, 2015, Claimant filed applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), alleging disability as of September 14, 2014 (Tr. 180, 187).   After the initial denial of the claim, Claimant requested an administrative hearing, held on March 28, 2017 in Lansing, Michigan before Administrative Law Judge ("ALJ") Lawrence E. Blatnik (Tr. 33).  Claimant, represented by attorney Bobby Ficklin, testified (Tr. 38-53), as did Vocational Expert ("VE") Georgette Gunther (Tr. 53-60). On May 31, 2017, ALJ Blatnik found that Claimant was capable of performing her past relevant work as sandwich maker and cashier (Tr. 15-25).   On November 16, 2017, the Appeals Council denied review (Tr. 1-3).  Claimant filed for judicial review of the final decision on January 17, 2018

## II.  BACKGROUND FACTS

Claimant, born January 26, 1959, was 58 when ALJ Blatnik issued his decision (Tr. 25, 180).  She completed high school and worked previously as a cashier and sandwich maker (Tr. 211).   She alleges disability as a result of depression, bipolar disorder, gastroesophageal reflux disease ("GERD"), alcohol abuse, suicidal ideation, and kidney problems (Tr. 210).

### A.    Claimant's Testimony

Claimant offered the following testimony:

She stood 5'3" and weighed 175 pounds (Tr. 38).  She was legally married but had

not had contact with her husband in over 10 years (Tr. 38).  She received $190 a month in "food stamps" but did not have another source of income (Tr. 38).   She had medical insurance (Tr. 38). She lived by herself (Tr. 39).  She lost her driver's license 10 years earlier as a result of a DUI conviction and now relied on family or friends for transportation (Tr. 39).  She had done some training to be a Certified Nurse Assistant ("CNA") but was not certified (Tr. 40).  She stopped working in December, 2016 due to sickness and leg pain (Tr. 40).  Before that she worked at a convenience store as a cashier and that the job also required her to stock shelves (Tr. 41).  She required help lifting boxes weighing over 30 pounds (Tr. 41).  She was fired from the cashier position for accidently selling cigarettes to a minor (Tr. 42).  She also worked at another establishment as a cashier but stopped working due to anxiety and depression brought on by working with the public and because of lower extremity pain (Tr. 42).  She also worked as a sandwich maker and as a nurse's aide (Tr. 43).

Claimant was depressed "all the time," experienced symptoms of bipolar disorder, and had chronic leg cramps and numbness (Tr. 44).  The leg condition had gotten worse in the past two years (Tr. 44).  She took Tramadol and Gabapentin for leg pain (Tr. 45).  She was unable to walk for more than four blocks or stand for more than 15 minutes (Tr. 45).  She was limited to lifting or carrying 15 pounds (Tr. 45).  She did not experience manipulative limitations but two months earlier, a finger laceration resulted in a blood infection requiring a five-day hospitalization (Tr. 46).  She was receiving psychiatric treatment and saw Nurse Practitioner Karen Olson once a month (Tr. 46).  Psychotropic medication side effects were

limited to occasional dizziness and mild nausea (Tr. 47). She smoked a pack of cigarettes a day and drank six or seven beers (Tr. 47). She denied the current use of illicit drugs (Tr. 48). She did not socialize on a regular basis and "spazz[ed] out" in groups of more than 15 people (Tr. 48). She experienced sleep disturbances resulting in daytime fatigue and agitation (Tr. 48). She did not experience problems with personal care activities or meal preparation (Tr. 49). She was able to perform household chores in short increments with rest periods in between (Tr. 49). Her daughter did her laundry (Tr. 49). She was accompanied by her daughter on her once-a-month grocery trips (Tr. 50). She did not use the internet often but went on Facebook a couple of times a week (Tr. 50). She had not taken any trips in the past two years and spent her time watching television (Tr. 50). She was unable to take walks, bike, or swim due to leg problems (Tr. 51).

Claimant reported that her depression began 25 years earlier when her three-year-old daughter died, noting that the day of the hearing would have been her daughter's birthday (Tr. 51). She reported that her depression subsequently increased due to an abusive husband and the death of her mother, to the point where she had become suicidal (Tr. 51). She refrained from attempting suicide at the urging of her daughter, her other children, and the love of her 17 grandchildren (Tr. 52). She visited with her grandchildren regularly but did not babysit (Tr. 52).

-4-

In response to questioning by her attorney, Claimant reported that she continued to smoke and drink regularly due to depression and her physical limitations (Tr. 52-53).

**B.    Medical Evidence**

**1. Treating Sources**

In July, 2013, Claimant sought emergency care for chest pain (Tr. 335). Her symptoms were deemed related to a recent respiratory infection (Tr. 335, 450). Imaging studies showed no evidence of acute cardiopulmonary disease (Tr. 339). Two months later, she sought emergency treatment for chest heaviness, nausea, and pain feeling similar to her previous heart attack 13 years earlier, that resulted in the placement of a cardiac stent (Tr. 340, 343, 346). Treating records note a history of hernia, cancer, and heart disease (Tr. 341). A stress test showed unremarkable results (Tr. 349, 356).

In November, 2013, Claimant was transported by ambulance for emergency treatment after taking a combination of alcohol and psychotropic medication (Tr. 358). Claimant's daughter reported that it was "the fourth time that she attempted to kill herself" (Tr. 358).

In March, 2014, Claimant reported fatigue and that she wanted to undergo testing for a hiatal hernia (Tr. 328, 375). Depression was identified as an active problem (Tr. 328). She reported that she could not afford prescription medicine for esophageal problems (Tr. 330, 370). She was referred to a gastroenterologist (Tr. 329).

July, 2014 emergency room records note Claimant's report of severe epigastric pain resulting from a hiatal hernia (Tr. 377).  Imaging studies showed no evidence of active cardiopulmonary process (Tr. 384).  In September, 2014, Claimant reported depression and that she was unable to keep a job (Tr. 331).  She denied current suicide ideation (Tr. 331).  She presented with a flat affect and razor cut scars on her left wrist (Tr. 331).  She reported no improvement in mood while taking Prozac (Tr. 332).  The records note that she had stents due to coronary heart disease (Tr. 332).

The following month, Claimant was transported to the hospital for emergency treatment after overdosing on psychotropic medication (Tr. 385).  She reported depression, active suicidal ideation, and hallucinations since her daughter died 20 years earlier (Tr. 386, 398).  Claimant reported that she was despondent due to losing her job,  and had attempted suicide on two other occasions earlier in the year (Tr. 399).  She was referred for inpatient treatment (Tr. 399).  Claimant noted in a self-assessment that her then estranged husband had been abusive (Tr. 475).  She rated her current physical condition as "poor," noting the conditions of a hiatal hernia, kidney disease, heart disease, and a history of cancer (Tr. 476).  She stated that her physical problems contributed to mood problems (Tr. 477).  She identified depression, anxiety, anger control, trauma, and mood swings as "severe" psychological problems (Tr. 478).  She admitted to alcohol abuse (Tr. 479).

December, 2014 records note an October, 2014 suicide attempt and inpatient mental health treatment (Tr. 333).  She denied current suicidal ideation (Tr. 333).  Nurse Practitioner

-6-

Karen Olson ("Nurse Olson") assessed the severity of the chronic depression as "moderate" (Tr. 456).  She noted no physical limitations (Tr. 457).

In January, 2015, Claimant reported renewed abdominal pain (Tr. 420).  In February, 2015, Claimant sought urgent care for constant stomach pain and diarrhea (Tr. 334).  A chest x-ray showed unremarkable results (Tr. 322). Later the same month, a chest x-ray showed "pulmonary hyper expansion related to underlying COPD" (Tr. 439).  In February, 2015, she again sought treatment for abdominal pain (Tr. 429, 441).  She reported that psychotropic medications were "working fine" (Tr. 452).  The same month, mental health records by Nurse Olson note that Claimant was "feeling better" but experienced situational stressors (Tr. 454, 498).  Nurse Olson noted "fair" judgment and concentration (Tr. 454).  The following month, Claimant exhibited a normal mood and unremarkable affect (Tr. 496).

March, 2015 emergency room records note Claimant's report of abdominal pain, nausea, and black stools (Tr. 500).  An endoscopy and a colonoscopy were both negative (Tr. 514).

Nurse Olson's May, 2015 records state that Claimant was tired "maybe due to watching her grandchildren lately" (Tr. 494).  Claimant reported that she enjoyed watching her grandchildren and that her mood had improved (Tr. 494).  Insight and judgment were deemed fair (Tr. 494).  She exhibited a normal gait, strength, and muscle tone (Tr. 494).  June, 2015 Doppler studies of the lower extremities done in response to Claimant's report of leg cramps were unremarkable (Tr. 519, 551).  The following month, Claimant denied

suicidal ideation (Tr. 668).

August, 2015 records by Nurse Olson noted signs of mild depression with normal thought content (Tr. 492). Emergency room notes from the same month state that Claimant admitted previously that she had taken an overdose of Norco in an attempt to harm herself (Tr. 520). She later denied trying to hurt herself but noted that she had been depressed lately (Tr. 520). The following month, Claimant sought emergency treatment for nausea, vomiting, abdominal pain, and leg spasms (Tr. 529, 680). In October, 2015 she sought urgent care for toe tingling and numbness (Tr. 538). She reported that Gabapentin no longer quelled the toe pain (Tr. 538). The same month, Nurse Olson noted that Claimant exhibited a normal mood with fair judgment and insight (Tr. 720).

A February, 2016 psychiatric medication review by Nurse Olson notes that Claimant's condition was worsening and that she was non-compliant with prescribed medication (Tr. (Tr. 718). She reported that she had intermittent suicidal ideation (Tr. 714, 716). Nurse Olson noted that remote and recent memory were intact (Tr. 717). March, 2016 Doppler studies of the lower extremities showed end vessel disease (Tr. 560). The same month, Claimant denied suicidal ideation (Tr. 687). September, 2016 x-rays of the lungs were unremarkable (Tr. 578). The following month, she sought emergency treatment for epigastric pain (Tr. 581). The following month, Claimant reported increasing neuropathy of the lower extremities radiating upward to her lower back (Tr. 684). The same notes state that she had not had EMG testing (Tr. 684). Treating records from October and November, 2016

note a prescription for an albuterol inhaler (Tr. 581, 589).  She sought emergency treatment in December, 2016 for abdominal pain (Tr. 595).  She was found to be positive for myalgia but negative for environmental allergies (Tr. 596).  Nurse Olson's records from the same month note that Claimant was working part-time at Subway but was worried about getting her hours cut (Tr. 702).

In January, 2017, Claimant was admitted for inpatient treatment for five days after developing a staph infection (Tr. 608, 616-618, 626).

In March, 2017, Nurse Olson completed a treating source statement, noting diagnoses of a severe depressive disorder, anxiety, and an alcohol disorder (Tr. 694).  She noted that symptoms included depressed and anxious moods, alcohol abuse, excessive drowsiness, and restless sleep (Tr. 694, 695).  Nurse Olson noted that Claimant had run out of psychotropic medications, missed appointments, and appeared depressed (Tr. 695).  She found mild limitation in the ability to understand, remember, or apply information and no limitation in the ability to interact with others or in concentrational abilities (Tr. 696).  She found moderate limitations in adaptability (Tr. 696).  She found no limitation in long-term memory, mild limitation in short-term memory, and no limitation in understanding, remembering, or carrying out instructions, but noted directly above that Claimant reported that "she stopped taking Topomax [but] did not remember why" (Tr. 697).  She then noted that Claimant was unable to concentrate for even 30 minutes and required "enhanced supervision" (Tr. 697).  She found that she could work alongside the public and others "sometimes" (Tr. 697).  She

-9-

found that concentrational problems would result in Claimant being off task more than 25 percent of the workday and would be likely to miss more than four days of work each month (Tr. 698).

The same month, Nurse Practitioner Jillian Rodney ("Nurse Rodney") completed a psychological assessment, noting the conditions of chronic pain syndrome, claudification, depression, and anxiety (Tr. 728). She noted a guarded prognosis, noting that Claimant was unable to walk more than 100 feet at one time (Tr. 728). She noted that Claimant experienced both depressive and manic symptoms (Tr. 728). She noted the symptoms of decreased energy, difficulties in concentrating, and apprehension (Tr. 729). She found marked limitations in understanding due to loss of memory "at times" (Tr. 730). She found mild limitations in interacting with others, marked limitations in concentration, and moderate limitation in adaptation (Tr. 730). She found moderate limitation in short term memory and mild limitation in long term memory (Tr. 731). She found that Claimant could maintain concentration for less than two hours but did not require enhanced supervision (Tr. 731). She found that Claimant would experience intermittent difficulty adapting to workplace changes and would be off task over 25 percent of the workday (Tr. 732).

As to Claimant's physical conditions, Nurse Rodney noted diagnoses of GERD, hiatal hernia, heart attack, and claudification (Tr. 738). She found that Claimant would require two days off work every month and would be off task more than 25 percent of the workday (Tr. 738). She found that Claimant was capable of lifting up to 20 pounds occasionally but was

limited to carrying less than 10 (Tr. 739).  She found that Claimant could sit, stand, or walk for up to four hours a day and required a sit/stand option (Tr. 739).  She found that Claimant could perform manipulative activity and use her feet on a frequent basis (Tr. 740).  She limited Claimant to rare climbing of ladders and scaffolds, balancing, stooping and crouching, and occasional climbing of stairs and ramps and kneeling (Tr. 740).  She precluded all crawling (Tr. 741).  As to environmental limitations, she precluded unprotected heights, moving mechanical parts, humidity, and vibrations with occasional operation of a vehicle, and exposure to airborne hazards and temperature extremes (Tr. 741).

### 2.  Non-Treating Sources

In May, 2015, George Starrett, Ed.D. performed a non-examining psychological assessment on behalf of the SSA, finding that Claimant experienced mild restriction in activities of daily living and social functioning and moderate difficulty in maintaining concentration, persistence, or pace (Tr. 68).  He noted "one or two" episodes of decompensation of extended duration (Tr. 68).  He concluded that Claimant could perform "simple tasks on a consistent basis" (Tr. 70).

### C.  Vocational Expert Testimony

Citing the *Dictionary of Occupational Titles* ("*DOT*"), VE Georgette Gunter classified Claimant's former work as a sandwich maker as unskilled and exertionally medium (light as performed by Claimant); cashier, unskilled/light (medium as performed); and nurse's aide,

semiskilled/medium[1] (Tr. 54-55).  In response to questioning by the ALJ, the VE testified that the ability to lift/carry 20 pounds occasionally and 10 frequently and sit, stand, or walk for six hours in an eight-hour workday; accompanied by limitations to "simple routine repetitive tasks," "simple work related decisions [with] occasional contact, interaction with supervisors, coworkers and the public" which did "not require . . . frequent significant changes or adaptations," would preclude all of Claimant's past relevant work (Tr. 55-56).

The VE testified that if the above-stated restrictions on interactions with others were eliminated, the individual could perform Claimant's past relevant work as a sandwich maker (as performed) and the cashier position as described in the *DOT* and as performed (Tr. 56).

The VE testified that based on her own professional experience, "some cashier positions" would include a sit/stand option allowing the worker to change position "every 20 to 30 minutes" (Tr. 56).  She testified that the sandwich maker position would not allow for a sit/stand option (Tr. 57).  She testified that the need to be off task for more than 15 percent of the workday, or, the need to miss more than one day of work each month would eliminate all unskilled work (Tr. 57).

---

[1]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

The VE testified that if the same individual were limited to medium work involving "only simple, routine, repetitive tasks, only simple work related decisions, only occasional contact, interaction with supervisors, coworkers and the public, work that did not require "frequent significant changes or adaptions," she could perform the exertionally medium, unskilled work of an assembler (900,000 positions in the national economy); inspector (16,000); and packer (166,000) (Tr. 58).

### D.  The ALJ's Decision

Citing the medical records the ALJ found that Claimant experienced the severe impairments of "muscle cramps in both legs, obesity, depression, an anxiety disorder, and a history of alcohol abuse" but that none of the conditions met or medically equaled the impairments found in Part 404 Appendix 1 Subpart P, Appendix No. 1 (Tr. 18-19).  He found that the condition of GERD was non-severe (Tr. 18).  As to the mental impairments, the ALJ found that Claimant experienced moderate limitation in understanding, remembering, or applying information; mild limitation in interacting with others; moderate limitation in concentrating, persisting, or maintaining pace; and mild limitations in adapting or managing oneself (Tr. 19-20).  The ALJ found that Claimant retained the Residual Functional Capacity ("RFC") for light work with the following additional restrictions:

> [She] can perform simple, routine, repetitive tasks and work involving only simple work-related decisions.  She cannot perform work that requires significant changes or adaptations (Tr. 20).

Citing the VE's final job findings, the ALJ determined that Claimant could perform her past

relevant work as a sandwich maker and cashier (Tr. 24, 56).

The ALJ accorded "little weight" to Nurse Rodney's assessment, noting that Rodney's finding that Claimant also experienced manipulative and environmental limitations was inconsistent with the hearing testimony and record as a whole (Tr. 23). He also accorded "little weight" to Nurse Olson's finding that Claimant was unable to concentrate for more than 30 minutes, would not maintain regular attendance, and would require enhanced supervision on the basis that it contradicted Nurse Olson's findings from the same assessment of only mild and moderate psychological limitations (Tr. 24). The ALJ accorded "moderate weight" to Dr. Starrett's non-examining findings that Claimant could perform simple tasks, but noted that "the record supports further adaptive restrictions based on the record, as developed at the hearing level" (Tr. 24).

## III.  STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way,

-14-

without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Claimant has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy."

*Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V. ANALYSIS[2]

### A. Nurse Rodney's Physical Assessment

Plaintiff argues first that the ALJ erred by rejecting Nurse Rodney's March, 2017 assessment of Claimant's physical abilities. *Plaintiff's Brief,* 4-14, *Docket #18,* Page ID 786. He notes that Nurse Rodney's findings of disabling impairment are uncontradicted by the remainder of the transcript and that the record does not contain consultative or non-examining findings to support the non-disability determination. *Id.* at 6-8. He argues that the ALJ failed to provide a sufficient rationale for rejecting Nurse Rodney's assessment. *Id.* at 8-14.

Under the regulations in effect at the time of Claimant's application, Nurse Rodney, a nurse practitioner (in contrast to a medical or osteopathic doctor) is not an "acceptable medical source." SSR 06-3p, 2006 WL 2329939, at *2 (August 9, 2006). As such, her opinion, while uncontradicted, is not entitled to controlling weight. *Id.* However, "[o]pinions from 'other medical sources'" such as a nurse practitioner "may reflect the source's judgment about some of the same issues addressed in medical opinions from 'acceptable medical sources,' including symptoms, diagnosis and prognosis, [and] what the

---

[2]Plaintiff's brief states that Claimant "took her own life with an overdose of Tramadol" approximately three weeks after the administrative decision was issued. *Plaintiff's Brief,* 2, *Docket #13,* Pg ID 784. The case is brought on Claimant's behalf by her son, Joseph Hernandez, who would be entitled to Claimant's past due benefits in the event that such benefits were eventually granted. *See* 42 U.S.C. § 404(d)(5).

individual can still do despite the impairment(s), and physical and mental restrictions." *Id* at *5.

"The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case.  Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case."  SSR 06-3p at *5.  The Ruling notes the increasing significance of "other" medical sources in the disability determination:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.  *Id.* at *3.

The opinion of a non-acceptable treating source "is entitled to consideration due to expertise and long-term relationship" with the patient.  *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011); 20 C.F.R. § 404.1513(d)(1).

Nurse Rodney stated that her professional qualifications included Adult-Gerontology Primary Care Nurse Practitioner Certification (Tr. 738).  She reported that she had treated Claimant one year and nine months and saw Claimant every one to two months for a variety of conditions including GERD, hiatal hernia, myocardial infarction, and claudification (pain and cramping of the lower extremities due to reduced blood flow) (Tr. 738).  At a minimum,

-17-

Nurse Rodney's opinion was significant and was entitled some weight regarding "key issues" such as "impairment severity and functional effects . . ." SSR 06-3 at *3.

As discussed above, Nurse Rodney's assessment includes findings that Claimant would miss two days of work each month and be off task for over 25 percent of the workday (Tr. 732). She found that Claimant was limited to lifting 20 pounds on an occasional basis, required a sit/stand option, and was limited to four hours of sitting, and standing or walking two to four hours (Tr. 739) She found that Claimant could perform manipulative limitations on a frequent rather than constant basis (Tr. 740). She found that Claimant should be limited to occasional exposure to airborne hazards (Tr. 741).

The ALJ acknowledged Nurse Rodney's assessment (Tr. 23), then went on to accord it "little weight" (Tr. 23). First, he noted that Nurse Rodney's finding of "manipulative restrictions" was unsupported by any other portion of the record (Tr. 23). He noted that while Nurse Rodney found the presence of manipulative restrictions, the record did not support a finding of any restrictions and that Claimant denied problems gripping (Tr. 23, 46). Second, he found that while Nurse Rodney found environmental restrictions regarding exposure to airborne and pollutants/hazards, "the record does not support any respiratory limitations" (Tr. 23). He noted that imaging studies included findings of "clear lungs" and normal chest x-rays (Tr. 23).

The ALJ's first reason for rejecting Nurse Rodney's findings is not based on a actual misstatement of the record but is nonetheless of concern. While the ALJ faulted the finding

of manipulative limitations, Nurse Rodney did not find extreme or even moderate manipulative limitation but rather, that Claimant was limited to frequent rather than continuous manipulative activity (Tr. 740).  While those findings are unaccompanied by explanation, the record shows that two month before the assessment, Claimant was hospitalized for five days after a finger laceration resulted in a staph infection (Tr. 626).  Moreover, the assessment noted Claimant's health history included a heart attack and ongoing fatigue.   While there are no imaging studies to support the limitation to frequent handling, fingering, and feeling, the limitation in activities of "reaching" and pushing/pulling from continuously to frequently, (a mild restriction) is not remarkable given Claimant's medical history of heart disease and the five-day hospitalization for a finger laceration only two months earlier.  Moreover, it is uncertain how the mild restriction in manipulative activity, by itself, undermines the Nurse Rodney's findings of disabling exertional and postural limitation.

The ALJ's rejection of *all* of Nurse Rodney's findings based on mild manipulative limitations is all the more concerning given that his other reason for rejection: "the record does not support any respiratory limitations" (Tr. 23) is contradicted by the transcript. A February, 2015 chest x-ray showed "pulmonary hyper-expansion related to underlying COPD" and a diagnosis of "obstructive chronic bronchitis with exacerbation" (Tr. 439). While Claimant reported in February, 2015 that she had "no lung problems that she [was] aware of,"  treatment records from both October and November, 2016 note a prescription for

an albuterol inhaler (Tr. 581-580).   The treating records document that she continued to smoke over the course of the relevant period.[3]  While the ALJ is correct that multiple chest x-rays were unremarkable, his statement that the record does not contain *any* support for a finding of respiratory problems is contradicted by the record (Tr. 23).

To be sure, the record contains some evidence to support the finding that a respiratory condition did not create work-related limitation.  However, the ALJ's rejected a long-term treating source's opinion based on his own erroneous statement that no evidence supported the need to avoid airborne hazards.  In other words, while he was free to reject the Nurse Rodney's finding of environmental limitations, his rationale for doing so was  based on his own misstatement of the record.

Despite the fact that the medical transcript includes March, 2016 Doppler studies of the lower extremities showing end vessel disease consistent with Claimant's report of ongoing leg and foot cramping, pain, and numbness, the ALJ offered no reason for rejecting the findings regarding the exertional and postural limitations (Tr. 560).  Nurse Rodney's finding that Claimant was unable to perform the carrying and walking requirements for even exertionally light work is particularly critical because it stands at odds with the RFC and

---

[3]It is well settled that Claimant's choice to continue smoking against medical advice could be used to undermine her allegations of limitation.  *Sias v. Secretary of Health and Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988).  However, the smoking, along with imaging studies and other records suggesting intermittent lung problems, supports Nurse Rodney's finding that Claimant's exposure to airborne irritants should be limited.

ultimate finding that Claimant could perform her past relevant work[4] (Tr. 24, 739).

Nurse Rodney's finding that Claimant was required to alternate between a sitting and standing position also undermines the conclusion that Claimant could perform her past relevant work as a sandwich maker and cashier (Tr. 24, 739). The VE testified that the need for a sit/stand option would eliminate the past work as a sandwich maker and that a sit/stand option was available in only "some" cashier positions (Tr. 56-57). The ALJ did not provide reasons for apparently rejecting the finding that Claimant required a sit/stand option (Tr. 20, 24-25).[5]

At best, it is unclear whether the inclusion of a sit/stand option would eliminate the past work as a cashier as the work was actually or generally performed. In making the Step Four finding, the Commissioner considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. SSR 82-61, 1982 WL 31387, at *2 (1982). If so, the claimant is not disabled. If the claimant is unable to perform the work as actually performed, the Commissioner then considers whether

---

[4] The question of whether Claimant was capable of performing her past relevant work is critical. Claimant, 58 at the time of the administrative decision, was of "advanced age." 20 C.F.R. § 404.1567. Rule 202.06, 20 C.F.R. part 404, subpart P, App. 2 directs a finding of disability for an individual 55 or over (advanced age) who is unable to perform past relevant work and is limited to exertionally light or sedentary, unskilled work. Without more, Nurse Rodney's finding that Claimant was unable to perform even exertionally light work supports a disability finding.

[5] While Claimant reported that she performed the cashier work at the medium exertional level (exceeding the RFC for light work), the VE testified that the job was generally performed at the light exertional level (Tr. 54-55).

the she can perform the functional demands and job duties of the occupation as generally required by employers throughout the national economy. *Id.*

My own review of the record reveals no indication that Claimant performed the past relevant work with a sit/stand option. The inclusion of a sit/stand option in RFC would thus eliminate the past relevant work "as performed." Further, the fact that "some" cashier positions offer a sit/stand option as testified to by the VE (Tr. 56) does not equate to a finding that that the work is "generally performed" in the national economy with a sit/stand option. Because a sit/stand option would wholly eliminate the former position of sandwich maker and the cashier position as actually performed and very likely, as generally performed in the national economy, consideration of Nurse Rodney's finding of the need for sit/stand option is required. Although as a general rule an ALJ is not required to provide a detailed discussion of why he rejected each of a non-acceptable source's discrete findings, the question of whether Claimant requires a sit/stand option is critical to the non-disability finding. The ALJ's failure to address this aspect of the assessment, coupled with his blanket rejection of the entire assessment based on a misreading of the record, requires a remand for consideration and discussion of Nurse Rodney's assessment.

In summary, Nurse Rodney found that Claimant was unable to perform exertionally light work and required a sit/stand option. The March, 2016 Doppler studies of the lower extremities support Nurse Rodney's findings. Notably, the transcript does not contain any other assessment of Claimant's physical abilities. Despite this, the ALJ rejected Nurse

Rodney's entire assessment based on the finding that the manipulative and environmental limitations were not supported by the record.  His rationale for the rejection is based in part on a misstatement of the record.  He did not discuss his reasons for rejecting Nurse Rodney's findings of exertional and postural limitations although those findings would direct a disability finding.  Finally, and no less importantly, the ALJ apparently overlooked the records upon which Nurse Rodney based her exertional findings.  The ALJ noted that 2015 Doppler studies of the lower extremities were normal (Tr. 22), but did not discuss or even acknowledge the Doppler studies performed in March, 2016 showing end vessel disease consistent with Claimant's long-term complaints of toe pain and numbness.

At a bare minimum, assuming that the ALJ was required only to "consider" Nurse Rodney's assessment and was not obliged to provide a detailed explanation for its rejection, his rationale for rejecting the assessment is based on misstatements of the record.  *See Sleight v. Commissioner of Social Sec.*, 896 F.Supp.2d 622, 635 (E.D.Mich. 2012)(remand for further fact-finding appropriate where "ALJ's factual misstatement" of the record formed the basis of erroneous findings).

### B.  The Evaluation of Psychological Evidence

Plaintiff also faults the ALJ for rejecting Nurse Rodney's March, 2017 assessment of Claimant's psychological limitations.  *Plaintiff's Brief* at 14-25.  He argues that while the ALJ accorded Nurse Rodney's psychological assessment "little weight" because she was not "a licensed mental health practitioner," he failed to acknowledge that Nurse Rodney's

findings were largely consistent with the assessment by Nurse Olson who treated Claimant for mental health issues. *Id.* at 20-21.  In turn, Plaintiff acknowledges that Nurse Olson's March, 2017 assessment contains internal inconsistencies, but argues that the proper remedy would be to seek clarification rather than summarily reject Nurse Olson's assessment which includes findings of significant and disabling psychological limitation. *Id.* at 21.

The ALJ rejected the respective psychological assessments by Nurses Rodney and Olson, finding first that Nurse Rodney provided treatment for only physical impairments (Tr. 24).  Standing alone, the ALJ's finding does not provide a basis for remand. *See Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 115 (6th Cir. November 18, 2008)(opinions regarding matters outside of source's area of expertise entitled to less weight than the opinions by a sources about matters within their speciality).

As to Nurse Olson, the ALJ found that her March, 2017 assessment was itself inconsistent (Tr. 24).  The ALJ is correct that Nurse Olson first stated that Claimant did not have concentrational or social limitations, then later stated that concentrational problems would cause her to be off task 25 percent of the workday and that she required a job with limited contact with others (Tr. 24, 696-697).    An ALJ may permissibly reject a treating source opinion for lack of consistency. 20 C.F.R. 1527(c)(4).  However, the lack of "consistency" as stated in the Regulation refers to the consistency between the "medical opinion and with the record as a whole," rather than inconsistencies within the opinion itself.

Within the space of the four-page assessment, Nurse Olson stated both that Claimant had no limitation in concentration and social functioning (Tr. 696) and a *significant* degree of impairment in both areas (Tr. 697-698).   It is impossible to reconcile the beginning of Nurse Olson's assessment with its later sections.   As with illegible records, the proper remedy is to seek clarification. *Cullin v. Commissioner of Social Security*, 2013 WL 951068 at *8 (E.D. Mich. January 25, 2013)(*citing Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001))("'Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry'"); *Ozier v. Barnhart*, 2004 WL 2038540, *9 (N.D. Ill. August 11, 2004)("'[U]nreadable' progress notes 'cannot be used to' reject a claimant's allegations"). Moreover, given that the current record does not contain any other evaluation of Claimant's work-related psychological limitations (aside from a non-examining evaluation performed in May, 2015 prior to at least one additional incident of self harm) "heightened consideration" is appropriate for the opinion of this long-term, albeit non-acceptable treating source. *See Gibson v. Commissioner of Social Security*, 2018 WL 4576792, at *5 (E.D.Mich. July 18, 2018)(although source was not entitled to deference accorded a treating, "acceptable source," heightened consideration appropriate for an examining source's findings where the transcript did not contain another assessment).   Given that Nurse Olson's findings are internally contradictory, a finding that they support or detract from Nurse Rodney's psychological assessment is premature.

-25-

While a remand to the administrative level is warranted for the above-discussed reasons, an award of benefits is premature.  A remand for an award of benefits is appropriate "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Hum. Servs.,* 17 F.3d 171, 176 (6th Cir.1994).  As such, I recommend a remand for further administrative proceedings consistent with this Report.

## <u>CONCLUSION</u>

For the reasons stated above, I recommend that Plaintiff's motion [Docket #13] be GRANTED to the extent that the case is remanded to the administrative level for further proceedings and that Defendant's motion for summary judgment [Docket #18] be DENIED.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: February 7, 2019

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 7, 2019, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen